# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 26-05047-CV-SW- |
| REAL PROPERTY LOCATED AT 103 BRIAR MEADOW DRIVE, CARL JUNCTION, MISSOURI, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS, | |
| REAL PROPERTY LOCATED AT 17979 HOTTEL SPRINGS ROAD, SENECA, MISSOURI, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS, | |
| APPROXIMATELY 4.58 ACRES IN NEWTON COUNTY, MISSOURI, DESCRIBED AS A PART OF THE SE ¼ OF THE SE ¼ OF SECTION 10, TOWNSHIP 24 NORTH, RANGE 34 WEST, NEWTON COUNTY, MISSOURI, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS, | |
| REAL PROPERTY LOCATED AT 5407 KENTUCKY ROAD, SENECA, MISSOURI, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS, | |
| Defendants. | |

## COMPLAINT FOR FORFEITURE IN REM

Plaintiff, United States of America, by its attorneys, R. Matthew Price, United States Attorney for the Western District of Missouri, and Anthony M. Brown, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.      This is an action to forfeit property to the United States for violations of 18 U.S.C.

§§ 981(a)(1)(A) and (a)(1)(C).

## THE DEFENDANTS IN REM

2.      The defendant properties consist of the following real properties:

a.  103 Briar Meadow Drive, Carl Junction, Missouri 64834 ("Briar Meadow"),

more thoroughly described as:

ALL OF LOT NUMBERED TWO (2) IN BRIAR MEADOW ESTATES PLAT #1, BEING A PART OF THE SOUTHEAST QUARTER (SE1/4) OF SECTION 16, TOWNSHIP 28, RANGE 33, IN THE CITY OF CARL JUNCTION, JASPER COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.

b.  17979 Hottel Springs Road, Seneca, Missouri 64865 ("Hottel Springs"), more

thoroughly described as:

Tract 1:
A part of the Southeast Quarter of the Southeast Quarter of Section 10, Township 24 North, Range 34 West, Newton County, Missouri, described as commencing at the intersection of the East line of said Section 10 with the North right of way line of US Rte 60, said point lying 87.11 feet North of the Southeast corner of Section 10; thence North 89°58'West along the North line of U.S. Rte 60, 660.0 feet to the point of beginning; thence continuing North 89°58'West 360.32 feet; thence leaving Rte 60 North 0°06'25"West 316.63 feet; thence South 89°58'East 360.32 feet; thence South 0°06'25"East 316.63 feet to the point of beginning.

Tract 2:
TOGETHER and with rights of ingress and egress over and across a 20 foot road being 10 feet on each side of the following described centerline: Beginning at the Southwest corner of the Southeast Quarter of the Southeast Quarter of Section 10, Township 24, Range 34, Newton County, Missouri, thence North 0°39'50"East a distance of 702.71 feet to the centerline of said road; thence South 89°45'36"East a distance of 300 feet; thence South 0°06'25"East a distance of 308.97 feet to the North line of the tract being conveyed and the point of ending.

2

c. Approximately 4.58 Acres in Newton County, Missouri ("4.58 Acres"), more thoroughly described as:

A part of the Southeast Quarter of the Southeast Quarter of Section 10, Township 24 North, Range 34 West, Newton County, Missouri, described as commencing at the intersection of the East line of said Section 10 with the North right of line with U.S. Route 60, said point lying 87.11 feet North of the Southeast corner of Section 10; thence North 222.48 feet (Deed) North 01 degree 58'06" East 222.48 feet (measured); thence leaving said East line North 89 degrees 58' West (Deed) North 87 degrees 55'16" West 242.25 feet (measured) to the Point of Beginning; thence North 89 degrees 58" West (Deed) North 87 degrees 55'16" West 417.93 feet (measured); thence North 01 degree 54'51" East 93.73 feet (measured); thence North 89 degrees 58' East (Deed) North 87 degrees 56'37" West 271.25 feet (measured); thence North 01 degree 08'01" East 297.44 feet; thence South 89 degrees 45'36" East (Deed) South 87 degrees 45'17" East 457.66 feet; thence South 29 degrees 11'41" East 455.94 feet to the Point of Beginning.

Subject to a 20 foot wide water line easement being located in part of the Southeast Quarter of the Southeast Quarter of Section 10, Township 24 North, Range 34 West, Newton County, Missouri, described as commencing at the intersection of the East line of said Section 10 with the North right of way line of U.S. Rte. 60, said point lying 87.11 feet North of the Southeast corner of said Section 10; thence N 01°58'06" E, 610.78 feet; thence N 87°45'17" E, 935.85 feet; thence S 02°14'43" W, 223.91 feet to the point of beginning of the 20 foot wide water line easement; thence N 75°31'51" W, 466.5 feet to the point of termination.

Together with rights to a 15.00 foot Ingress Egress Easement being 7.50 feet either side of the following described centerline, Commencing at the Southeast Corner of the Section 10, Township 24, Range 34, Newton County, Thence North 01 Degrees, 58 Minutes, 06 Seconds East 303.72 feet, Thence North 87 Degrees, 55 Minutes, 16 Seconds West 660.00 feet, Thence North 01 Degrees, 54 Minutes, 51 Seconds East 93.73 feet, Thence North 87 Degrees, 56 Minutes, 37 Seconds West 271.25 feet, Thence North 01 Degrees, 08 Minutes, 01 Seconds East 7.50 feet to the Point of Beginning, Thence North 86 Degrees, 56 Minutes, 37 Seconds West 88.98 feet, Thence South 89 Degrees, 55 Minutes, 48 Seconds West 283.09 feet to the Point of Termination.

ALSO SUBJECT to all easements, conditions, restrictions and rights-of-way of record and those not of record.

Subject to easements, restrictions and reservations of record, if any.

3

d. 5407 Kentucky Road, Seneca, Missouri 64865 ("Kentucky Road"), more thoroughly described as:

Tract 1:
The Northwest Quarter of the Northwest Quarter of Section 16, Township 25, Range 33, Newton County, Missouri, EXCEPT the West 550 feet of the South 465 feet AND EXCEPT the West 624 feet of the North 416 feet AND EXCEPT the East 95 feet AND EXCEPT the East 110 feet of the North 430 feet, AND EXCEPT Part of the Northwest Quarter of the Northwest Quarter of Section 16, Township 25 North, Range 33 West, Newton County, Missouri, more particularly described as commencing at the Northwest corner of Section 16, Township 25 North, Range 33 West, Newton County, Missouri, thence South 00° 33'02" East 225.00 feet with the West line of said Section 16 to the point of beginning, thence North 89°45'31" East 417.42 feet, thence South 00°33'02" East 208.71 feet, thence South 89°45'31" West 417.42 feet to the West line of Section 16, thence North 00°33'02" West 208.71 feet to the point of beginning. AND EXCEPT Commencing at the Northwest corner of Section 16, Township 25, Range 33, Newton County, Missouri, thence North 89°54'01" East 1177.95 feet along the North line of Section 16 to the point of beginning, thence South 00°06'25" East 430.00 feet, thence North 89°54'01" East 35 feet, thence North 00°06'25" West 430.00 feet, thence South 89°54'01" West 35.0 feet to the point of beginning. AND EXCEPT Commencing at the Northwest corner of Section 16, Township 25, Range 33, Newton County, Missouri, thence North 89°54'01" East along the North line of Section 16, 1212.95 feet, thence South 00°06'25" East 430 feet to the point of beginning, thence South 00°06'25" East 896.32 feet, thence North 89°56'31" East 75.00 feet, thence North 00°06'25" West 896.37 feet, thence South 89°54'01" West 75 feet to the point of beginning.
AND
A tract of land in the Northwest Quarter of the Northwest Quarter of Section 16, Township 25, Range 33, Newton County, Missouri, more particularly described as follows, to-wit: beginning at a point 417.42 feet East of the Northwest corner of the Northwest Quarter of said Section 16, thence South 408.71 feet, thence East 208 feet, thence North 408.71 feet, thence West to the point of beginning.

Tract 2:
All that part of the Northwest Quarter of the Northwest Quarter of Section 16, Township 25, Range 33, Newton County, Missouri, being more particularly described as follows: commencing at the Northwest corner of said Section 16, thence South 00°33'02" East along the West line of said Quarter-Quarter 433.71 feet, thence leaving said line North 89°45'31" East 417.42 feet to the point of beginning, thence North 00°33'02" West 125.0 feet, thence North 89°45'31"

4

East 252.0 feet, thence South 00°33'02" East 1730.0 feet, thence South 89°45'31" West 252.0 feet, thence North 00°33'02" West 48.0 feet to the point of beginning.

Subject to easements, restrictions, reservations, and covenants of record, if any.

The recorded owner of 103 Briar Meadow Drive, Carl Junction, Missouri, 17979 Hottel Springs Road, Seneca, Missouri, and approximately 4.58 acres in Newton County, Missouri, is Jason Huston. The recorded owner of 5407 Kentucky Road, Seneca, Missouri, is Casey R. Crider.

3. The defendant properties have not been seized but are located within the jurisdiction of the Court as described below. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1), post notice of this action and a copy of the Complaint on the defendant properties and serve notice of this action on the defendant properties owners, and any other person or entity who may claim an interest in the defendant real properties, along with a copy of this Complaint. The United States may elect to file Lis Pendens as to the defendant properties at any time.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

5. This Court has *in rem* jurisdiction over the entirety of the defendant properties pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395,

5

because the action accrued in this district and the defendant properties in Missouri are found in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the Western District of Missouri, and pursuant to 28 U.S.C. § 1395, as to defendant properties in Missouri because the action accrued in this district and the defendant is found in this district.

## BASIS FOR FORFEITURE

7. The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in transactions or in attempted transactions in violation of 18 U.S.C. §§ 1956 and/or 1957 or are properties traceable to such property.

8. The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or are derived from proceeds traceable to an offense constituting a Specified Unlawful Activity ("SUA") as defined in section 1956(c)(7) and 1961(1) of Title 18, United States Code, or a conspiracy to commit such an offense. Such offenses include, but are not limited to, violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

## THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

9. The United States Food and Drug Administration ("FDA") is the federal agency charged with responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301-399i. One of the purposes of the FDCA is to ensure that drugs sold for human use are safe and effective for their intended use and bear labeling that contains true and accurate information.

6

10.     The FDCA defines a "drug" under 21 U.S.C. § 321(g) as:

> (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended to use as a component of any articles specified above.

11.     The FDCA defines "prescription drugs" as drugs that, because of their toxicity and other potential for harmful effects, or the method of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A). A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to administer such drug as a condition of the FDA's approval of the drug. 21 U.S.C. § 353(b)(1)(B).

12.     The act of dispensing a prescription drug without a valid prescription from a practitioner licensed by law to administer such a drug is an act that results in the drug being misbranded while held for sale. See 21 U.S.C. § 353(b)(1).

13.     The FDCA makes it a crime to introduce or deliver for introduction, or cause the introduction or delivery, into interstate commerce, of any drug that is misbranded. See 21 U.S.C. § 331(a).

14.     A misbranded drug is one in which the labeling is false or misleading, or fails to meet specific regulatory requirements for packaging, ingredients, and warnings. See 21 U.S.C. § 352.

15.     Further, the FDCA does not permit the introduction or delivery for introduction into interstate commerce a "new drug" unless it has been approved by the FDA. A "new drug" cannot

7

be lawfully introduced or delivered for introduction into interstate commerce unless the FDA has approved a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") with respect to such drug, or such drug was exempted from approval pursuant to an effective Investigational New Drug Application ("IND"). 21 U.S.C. §§ 331(d) and 335 (a), (b), (i), and (j). Under the FDCA, a "new drug" is any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof …" 21 U.S.C. § 321(p)(1).

16.     The FDCA imposes strict-liability misdemeanor punishment for violations of 21 U.S.C. § 331. The FDCA imposes felony punishment of up to three years of imprisonment and/or a fine for conduct committed with an "intent to defraud or mislead" either consumers or government regulators. 21 U.S.C. § 333(a)(2).

## BACKGROUND OF INVESTIGATION

17.     In June 2025, federal agents began investigating Jason Huston ("Huston") and Casey Crider ("Crider") d/b/a Blome Research, LLC ("Blome Research") regarding the sale of unlicensed weight loss drugs, including "semaglutide", "tirzepatide", and "retatrutide" ("peptides") on a website operated by them.

18.     In approximately September 2024, the Missouri Board of Pharmacy ("MBP") was provided with screenshots from Crider's Facebook page and a Facebook Messenger chat with a pharmacist where Crider offered to sell tirzepatide for weight loss, if the pharmacist was "not the FDA".

8

19. On September 24, 2024, an employee with MBP acting in an undercover capacity emailed Blome Research at an address provided on the website to inquire about the source of the products being offered for sale.

20. The responding party advised that, "[i]t all comes made and done from the factory," and "[i]t's in china, I just know they come here and we 3rd party test them at a lab in CA and the lab sends us a report for purity and it is 100% pure."

21. On October 23, 2024, the MBP placed an undercover order with Blome Research for four vials of semaglutide. On October 30, 2024, MBP placed an undercover order with Blome Research for three vials of bacteriostatic water, a substance used to mix the semaglutide. The two items were sent via United States Postal Service ("USPS") Priority Mail, displaying Blome Research, 103 Briar Meadow Drive, Carl Junction, Missouri 64834 as the return shipping address.

22. The MBP issued a cease-and-desist letter to Blome Research on November 1, 2024, requesting that they discontinue the unlicensed practice of pharmacy within the state of Missouri and drug distributorship, and Blome Research acknowledged receipt of the letter, agreeing to stop all business as of the receipt date.

23. Neither Crider nor Hutson is a licensed Medical Doctor or Doctor of Pharmacy. Further, no known employees at Blome Research are licensed Medical Doctors or Doctors of Pharmacy.

24. On July 30, 2025, federal agents accessed the website operated by Blome Research and found a new landing page, stating "Blome Research" and "Due to New Regulations We have had to make some changes to the names of a couple of products," which were listed as "GLP-Tir = Tirz," "GLP-Sem = Sema," and "GLP-Ret = Reta".

25. Additionally, federal agents observed that the website now required users to click on a button labeled "I understand" following a disclaimer which read: "OUR PRODUCTS ARE NOT DIETARY SUPPLEMENTS OR MEDICATIONS. BY PURCHASING THEM YOU AGREE TO USE THEM IN A LEGAL MANNER. IT IS YOUR RESPONSIBILITY TO KNOW WHAT THAT IS."

26. Upon hitting "I understand", the home page of the website showed vials bearing labels for various drugs, pictured next to their sale price, including "Semaglutide," "Retatrutide[1]," "Tirz," and "reconstitution solution," among others.

27. A federal agent reviewed the website's profile for retatrutide, priced at $200.00 for a 20mg vial, which included disclaimers for "NOT FOR HUMAN USE" and "RESEARCH PURPOSES ONLY" below the product header.

28. Investigators determined that the phone numbers listed on the Blome Research website belonged to Huston and Crider and the address on the return label was the residence of Huston.

29. Inquiries of the FDA's list of current new drug applications ("NDA") showed no approved NDAs for Blome Research, and thus, Blome Research was not permitted to offer retratruide, or any other new drugs.

30. Between January 4, 2024, through September 8, 2025, Huston, Crider, and Blome Research shipped approximately 31,776 parcels from Carl Junction, Joplin, and Seneca, Missouri, utilizing postage purchased from an online provider.

---

[1] Retatrutide is a weight loss drug that is not FDA approved, nor is there any FDA approved drugs containing Retatrutide as an active ingredient.

10

31. Postal business records determined that a large portion of these parcels entered the mail stream at defendant Hottel Springs, where they received their initial acceptance scan when a mail carrier picked up the packages from the residence.

32. In mid to late 2025, search warrants executed by federal agents on packages shipped from Blome Research revealed misbranded pharmaceuticals offered for sale on their website, including semaglutide, retratruide, and tirzepatide.

33. On November 24, 2025, an officer acting in an undercover capacity ("UCA1") made a recorded telephone call to Crider.

34. UCA1 told Crider that UCA1 was trying to lose some weight and asked for suggestions. Crider responded by telling UCA1 retatrutide would be the best option for UCA1 to use and explained that a lot of people are starting to use retatrutide.

35. During the phone call, Crider stated that he was "not supposed to give this information because we're not pharmacists or doctors," but that he lost 100 pounds in 11 months with the "same stuff we sell." Crider then went into detail describing dosing rates for UCA1 and provided instructions on what needles to use.

36. On February 24, 2026, a federal agent, acting in an undercover capacity ("UCA2"), placed an order for one vial of TIRZ 20 from the Blome Research website for $80.00 and an additional $13.00 for shipping, without providing a prescription, providing an address within the District of Kansas for receipt.

37. UCA2 received a package at a location in the District of Kansas, shipped via USPS Priority Mail, which had been introduced into the mail stream when it was picked up by a USPS carrier at defendant Hottel Springs.

11

38. Inside the parcel received by UCA2, there was one vial labeled "TIRZ 20", and a packing slip referencing UCA2's order number; no use instructions or warnings were included.

39. On Friday, March 13, 2026, UCA2 called Huston to discuss the previous order and the potential for shipping peptides internationally.

40. Huston stated that he could not legally give advice on how to use the product, but then stated it was perfectly clear for personal use and provided instructions on how to use the product for weight loss purposes.

41. Huston stated he was hesitant to ship internationally because Blome Research was on a "watch list", and that if UCA2 needed the product shipped internationally, the only option would be an electronic money transfer through Zelle or by check, as the website was not set up to take international orders.

42. Huston also advised that Blome Research can arrange "porch pick ups" for people willing to drive to Seneca, Missouri to avoid shipping costs.

**Mail Fraud**

43. Between July 2023 through present, Huston, Crider, and Blome Research have used the mail in part of a scheme to obtain money and property by means of false pretenses, representations, and promises.

44. The products Huston, Crider, and Blome Research sold are "drugs" under the FDCA, because they are intended to affect the structure and function of the body, despite labeling them as being for "research purposes". See 21 U.S.C. § 321(g)(1).

12

45. The products Huston, Crider, and Blome Research sold are misbranded, as their labels bore false and misleading branding, stating the products were for research purposes only, yet instructing consumers how to use them to affect the structure and function of the body.

46. Huston, Crider, and Blome Research used the internet to advertise and sell these misbranded drugs through interstate wires.

**Financial Analysis**

47. During the investigation, federal agents obtained a large volume of bank, business, and financial records of accounts owned by Huston, Crider, and Blome Research, finding at least 50 bank accounts owned or controlled by Huston, Crider, and/or Blome Research.

48. Among these accounts are Bluevine Inc. account number x6214 ("Bluevine x6214"), in the name of "Blome Research LLC Jason Hutson", with an address of defendant Hottel Springs; U.S. Bank account number x9995 ("US Bank x9995"), in the name of Huston, with an address of defendant Hottel Springs; US Bank account number x8547 ("US Bank x8547"), in the name of Huston, Bank of America account number x2564 ("BOA x2564") in the name of Blome Research, with an address of defendant Hottel Springs; and Arvest Bank account number x9359 ("Arvest x9359") in the name of Crider, with an address of defendant Kentucky Road, all of which are accounts held at financial institutions.

49. Beginning in approximately May of 2023, Huston and Crider, d/b/a Blome Research, began making numerous large purchases from online chemical companies advertised as being located in the People's Republic of China ("PRC").

50. Between June 2023 and November 2023, numerous international wire debit transfers between accounts associated with Blome Research to companies associated with

13

chemical sales in the PRC, totaling over $1 million, were located coming out of Bluevine x6214, US Bank x9995, and BOA x2564.

51.     From additional analysis of their bank accounts, numerous regular and routine deposits into accounts owned and controlled by Huston, Crider, and Blome Research were located for the sale of weight loss peptides listed for sale on their website, with many of the deposits referencing "blome," "order," "research," "tirzepatide," "tirz," "peptides," "meds," "sema," "semaglutide," and other similarly related references.

52.     Huston, Crider, and Blome Research maintained approximately 12 different "intake" accounts in which they would receive funds from buyers of illegal peptides, including four PayPal accounts, three CashApp accounts, two Zelle accounts, two MetaPay accounts, and Bluevine x6214.

53.     Huston and Crider also accepted personal checks from customers for the sale of weight loss peptides, with the memos of said checks oftentimes listing, "med," "medication," "medical supplies," "blome," "order," "peptide," or sometimes the name of the peptide the customer was paying for, which were deposited in the aforementioned "intake" accounts.

54.     According to financial records, Huston and Crider last had income from legitimate sources in approximately November 2023 and May 2024, in the amounts of $4,334.06 and $2,303.04 respectively.

55.     Between July 2023 and December 2025, Huston, Crider, and Blome Research accepted approximately $15 million into various bank accounts they owned and controlled, primarily from the sales of illegal misbranded peptides.

14

56. Huston and Crider would then transfer the sales proceeds into bank accounts they owned and controlled to make personal purchases.

57. Among (but not limited to) these accounts are the aforementioned US Bank x9995 account; U.S. Bank account number x8596 ("US Bank x8596"), in the name of Huston, with an address of defendant Hottel Springs; Bank of America account number x8285 ("BOA x8285") in the name of Huston, with an address of defendant Hottel Springs; Arvest Bank account number x5074 ("Arvest x5074") in the name of Huston, with an address of defendant Hottel Springs; the aforementioned Arvest x9359 account; and Arvest Bank account number x3253 ("Arvest x3253") in the name of Crider, with an address of defendant Kentucky Road, all of which are accounts held at financial institutions.

### Defendant Properties

#### Briar Meadow

58. On or about June 4, 2024, Huston wired $165,947.22 to Rocket Mortgage from US Bank x8596 to pay off a mortgage on defendant Briar Meadow, traceable to proceeds earned from the above-described scheme.

#### Hottel Springs

59. On or about July 26, 2024, Huston purchased cashier's check number 8227509657, payable to Newton County Abstract & Title, in the amount of $6,000 from US Bank x9995, presenting it towards the purchase of defendant Hottel Springs.

60. Further, on August 1, 2024, Huston purchased cashier's check number 8227509675 payable to Newton County Abstract & Title in the amount of $278,801.81 from US Bank x8596 to purchase defendant Hottel Springs, traceable from proceeds from the above-described scheme.

15

<u>4.58 Acres</u>

61. On or about October 17, 2025, Huston purchased three separate cashier's checks, numbered 8227510423, 8227510424, and 8227510425, each valued at $50,000 and payable to Ashlea Ritter, Cale Ritter, and Fidelity Abstract & Title from US Bank x9995, presenting them towards the purchase of defendant 4.58 acres, which adjoined defendant Hottel Springs, all traceable from proceeds from the above-described scheme.

<u>Kentucky Road</u>

62. On or about June 7, 2024, Crider caused check number 240109 in the amount of $89,827.66 to be issued from Arvest x3253 to pay off a mortgage on defendant Kentucky Road, traceable from proceeds from the above-described scheme.

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM FOR RELIEF**

63. The Plaintiff repeats and incorporates by reference the paragraphs above.

64. By the foregoing and other acts, the Defendant Properties were involved in transactions or attempted transactions, in violation of 18 U.S.C. §§ 1956 and/or 1957, or are property traceable to such property, and therefore, are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A).

## **SECOND CLAIM FOR RELIEF**

65. The Plaintiff repeats and incorporates by reference paragraphs 1 through 62.

66. By the foregoing and other acts, the Defendant Properties constitute, or were derived from, proceeds traceable to violations of 18 U.S.C. § 1314, that is, mail fraud, and therefore are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

16

## THIRD CLAIM FOR RELIEF

67.     The Plaintiff repeats and incorporates by reference paragraphs 1 through 62.

68.     By the foregoing and other acts, the Defendant Properties constitute, or were derived from, proceeds traceable to violations of 18 U.S.C. § 1343, that is, wire fraud, and therefore are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE the United States prays that the Defendant Properties be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

**R. MATTHEW PRICE**
United States Attorney

By:     */s/ Anthony M. Brown*
Anthony M. Brown
Assistant United States Attorney
Missouri Bar No. 62504
901 East St. Louis Street #500
Springfield, Missouri 65806
Telephone: (417) 831-4406
E-Mail: Anthony.Brown2@usdoj.gov

17

**<u>VERIFICATION</u>**

I, Postal Inspector James A. Dye, hereby verify and declare under penalty of perjury that I am a Postal Inspector with the United States Postal Inspection Service, that I have read the foregoing Verified Complaint <u>in</u> <u>Rem</u> and know the contents thereof, and that the factual matters contained in paragraphs <u>17</u> through <u>62</u> of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Postal Inspector of the United States Postal Inspection Service.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.


Dated   6/2/2026

                                        */s/ James A. Dye*
                                         James A. Dye
                                         Postal Inspector
                                         U.S. Postal Inspection Service